# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Christine Hamilton, | : | |
| Petitioner | : | |
| | : | No. 102 C.D. 2025 |
| v. | : | |
| | : | Submitted: April 13, 2026 |
| Ventura Foods, LLC (Workers' | : | |
| Compensation Appeal Board), | : | |
| Respondent | : | |

BEFORE: HONORABLE ANNE E. COVEY, Judge
HONORABLE LORI A. DUMAS, Judge
HONORABLE STELLA M. TSAI, Judge

## *OPINION NOT REPORTED*

**MEMORANDUM OPINION BY**
**JUDGE DUMAS**                                    **FILED: June 3, 2026**

Christine Hamilton (Claimant) has petitioned this Court to review an adjudication of the Workers' Compensation Appeal Board (Board), entered December 19, 2024, which affirmed the decision of the Workers' Compensation Judge (WCJ) in favor of Ventura Foods, LLC (Employer). On appeal, Claimant generally contends the WCJ's decision was unreasonable. We affirm.

## I. BACKGROUND[1]

Claimant had a long history of low back problems. She received social security disability benefits for about 15 years and had back surgery in the late 2000s. Tr., 3/9/22, at 30 (testifying the surgery was for "wear and tear over time and possible

---

[1] Unless otherwise stated, we derive the background from the WCJ's and Board's decisions, which are supported by substantial evidence, and in the light most favorable to Employer as the prevailing party. *Cinram Mfg., Inc. v. Workers' Comp. Appeal Bd. (Hill)*, 975 A.2d 577, 583 (Pa. 2009) (*Cinram*).

hereditary [sic]"). A 2015 lumbar MRI revealed degenerative narrowing of the spinal canal, *i.e.*, stenosis.

In June 2019, Claimant went to the emergency room with low back pain radiating into her left leg and urinary incontinence. An MRI revealed findings similar to the 2015 study. She was referred to a neurosurgeon but declined surgery. In May 2020, Claimant visited a medical center and did not report any back pain. By September 2020, she reported a history of numbness and tingling in both legs and was again referred to neurosurgery. Grandrimo Dep. Tr., 8/2/23, at 33; Prisk Dep. Tr., 6/13/23, at 32-37.

In January 2021, Claimant's disability benefits ended. She began working for Employer in May as an inspector. Her duties included frequently moving buckets or "40- or 50-pound" bags of food ingredients and scanning paperwork. Tr., 3/9/22, at 8-11. Claimant denied having low back pain when she started working for Employer but clarified that she "had it off and on depending on" what she did and whether she "overdid" it. *Id.* at 10.

In July 2021, Claimant saw her primary care physician and reported radiating leg pain and back spasms. Medical records documented a left-sided radiculopathy.[2] Claimant told her physician, "I can't do it. I am miserable working in [the] spice room weighing ingredients at" Employer. Grandrimo Dep. Tr. at 32; Ex. C-7 (Prisk's report), at 2. Her physician provided a note stating Claimant "can only work a normal workweek," and wrote "there is a likely overlay with wanting her disability back." Prisk Dep. Tr. at 16, 39 (citation modified).[3]

---

[2] Radiculopathy is "dysfunction of one or more spinal nerve roots, characterized by pain and sensory and motor disturbances and often caused by compression; an instance of this." *Radiculopathy*, Oxford English Dictionary, https://doi.org/10.1093/OED/1068204295 (citation modified) (last visited June 3, 2026).

[3] Around this time, Claimant told her lead that "it was getting too much on [her] back."

Employer then reassigned Claimant to a different position. The position required "rework" of damaged products: picking up 30-to-35-pound boxes from a pallet, inspecting them, repacking them, and carrying those boxes to another pallet to restack and reship. Claimant did rework about eight to ten times, typically three to five hours, and her back hurt each time. Tr., 3/9/22, at 14-17.

On October 15, 2021, the night of the injury, Claimant "worked two hours on the machine." *Id.* at 16. Then, "it was ten hours straight doing this lifting and restocking the boxes onto the pallet," *i.e.*, rework. *Id.* Claimant testified the work "was making [her] back hurt terribly." *Id.* at 18.

When the daytime supervisor arrived, Claimant "told him that [her] back was killing" her. *Id.* She did not specifically inform the supervisor that her back pain was from lifting boxes. Claimant worked the next day without doing rework and told the "fill-in for the lead" that her "back was killing [her] from the night before." *Id.* at 20, 40. She did not fill out any accident report, did not return to work after that shift, and "called off sick" for the next few shifts. *Id.* at 25, 41-42.

The "following week," Claimant sought treatment at the emergency room. *Id.* at 20-21. She explained that she had delayed treatment because she thought if she "took a break . . . it would go away." *Id.* at 20. At the hospital, she reported "worsening pain in the left back with radiation which goes to her left foot and numbness in her left toes." Grandrimo Dep. Tr. at 30. Claimant received an MRI and was referred to an orthopedic surgeon. That surgeon diagnosed Claimant with "persistent low back pain, with lower extremity radiculopathy, recent worsening in relation to her work-related duties," and prescribed physical therapy, a

Tr., 3/9/22, at 10. Her lead temporarily modified Claimant's job duties to scanning paperwork only for two to three weeks because "other people would possibly get upset if they didn't have a turn in that job." *Id.* at 11-12. Claimant unsuccessfully requested a reasonable accommodation.

3

back brace, and "activity modification." Prisk Dep. Tr. at 46 (citation modified); Tr., 3/9/22, at 21.

Claimant was also referred to a neurosurgeon, whom Claimant saw in April 2022. The neurosurgeon ordered an MRI, which revealed "disc herniation and spinal stenosis that was severe at the canal." Prisk Dep. Tr. at 20. Claimant discussed surgery but did not pursue it.

Claimant saw yet another neurosurgeon, Dr. Slotkin, in September 2022. Dr. Slotkin diagnosed Claimant with "neurogenic claudication symptoms, including shocks that . . . caused her to buckle over and numbness in her feet . . . ." *Id.* Neurogenic claudication describes "global" symptoms "including fatigue or weakness in the legs, that can occur with certain movements or positions that is often something we see with spinal stenosis . . . ." *Id.* at 21.[4] No doctor gave Claimant a note excusing her from work. Tr., 3/9/22, at 46.[5]

Meanwhile, Claimant filed her claim petition in February 2022, alleging a work injury of "low back pain," inflammation with pain radiating into her legs, and narrowing of the lower spinal canal. Employer denied the claim, reasoning that Claimant "did not suffer a work-related injury including aggravation of a pre-existing condition or disease contracted as a result of employment." WCJ Op. at 3.

The WCJ held several evidentiary hearings, at which Claimant testified virtually and Drs. Victor Prisk and John Grandrimo testified via trial depositions. We detail the two experts' testimony below to provide context for the parties'

[4] *See also* 7 Att'ys Med. Advisor § 71:3 (defining neurogenic claudication as "Symptoms of leg pain (and occasionally weakness) on walking or standing, relieved by sitting or spinal flexion, related to neural compression, usually spinal stenosis").

[5] Dr. Slotkin's first name is not in the record. After not returning to work for Employer in October 2021, Claimant found another job for a different employer in early 2022. That job was "less strenuous" on her back. Tr., 3/9/22, at 49. Claimant was laid off or fired in March 2023. Tr., 4/26/23, at 11, 16; *see generally* Tr., 3/9/22, at 28.

arguments. The WCJ found Claimant's testimony "credible, but not competent to relate her symptoms to her work duties or to establish any period of disability arising out of a work injury." WCJ Op. at 8.

For four reasons, the WCJ found Dr. Grandrimo's findings and opinions "more credible than the findings and opinions of Dr. Prisk." *Id.* In summary, the WCJ relied on (1) Dr. Prisk's concessions regarding causation; (2) Dr. Grandrimo's opinion that Claimant's symptoms reflected the "natural progression of her degenerative condition," consistent with the MRI findings; (3) the absence of a causal connection between neurogenic claudication symptoms and the October 15th work activities; and (4) the lack of clinical correlation between Claimant's symptoms and the L4 dermatome. *Id.* The WCJ concluded that Claimant had "not met her burden to establish by sufficient, competent, credible evidence . . . that she sustained a work injury on October 15, 2021." *Id.* at 9.

Claimant timely appealed, and the Board affirmed. The Board held that substantial evidence of record supported the WCJ's findings. Bd. Op., 12/19/24, at 5-6. Claimant timely appealed to this Court.[6]

## II. ISSUES

Claimant contends that the WCJ's and Board's "decisions were arbitrary, capricious and not supported by substantial competent evidence." Pet'r's Br. at 4.

## III. DISCUSSION[7]

### A. Experts' Testimony

We first describe the relevant anatomy and detail the disputed expert

---

[6] Claimant's USPS Form 3817 reflects timely filing as the appellate deadline fell over a three-day holiday weekend. *See* Pa.R.A.P. 1514(2); 1 Pa.C.S. § 1908 (excluding the last day of a time period that falls on a weekend or state holiday).

[7] "Under the appellate standard of review pertaining to administrative agency

5

testimony before summarizing the parties' arguments. The lumbar spine consists of five vertebrae, numbered L1 through L5, stacked above the sacrum (S1). Facet joints connect each pair of vertebrae, and between each pair sits a disc that can bulge or herniate, with herniation being a more severe bulge. Stenosis is a "narrowing of the vertebral canal . . . through which the spinal nerves pass." A laminectomy is the surgical removal of the lamina, which is a bony structure surrounding the spinal canal.[8]

Dr. Prisk, Claimant's expert, reviewed, *inter alia*, Claimant's prior MRIs from 2015, June 2019, and October 2021, along with medical records from Claimant's other doctors, including Dr. Slotkin. Dr. Prisk examined Claimant once and noted numbness in the toes of both her feet. He diagnosed Claimant with "a longstanding history of lumbar spinal stenosis and a prior L4-5 laminectomy." Prisk Dep. Tr. at 23.

Dr. Prisk opined that Claimant "developed an aggravation of her spinal stenosis and acceleration of her disc disease and pain aggravation . . . at the L3-4 level as a result of her reworking of the pallets on October 15, 2021." *Id.* That aggravation, per Dr. Prisk, rested on Claimant's "symptoms in her toes and her feet and her need for more consistent care after this injury." *Id.* Dr. Prisk explained the toe numbness as a product of neurogenic claudication, a "global" and "nonfocal" condition affecting "multiple nerve distributions." *Id.* at 21, 27. Dr. Prisk described Dr. Slotkin's September 2022 examination as also reflecting claudication: Claimant

---

adjudications, agency findings are subject to judicial review to assure that they are supported by substantial evidence. Substantial evidence is evidence which a reasonable mind would accept as adequate to support a conclusion." *Cinram*, 975 A.2d at 583 (citations omitted).

[8] 1 Att'ys Med. Advisor §§ 2:16 (describing the spine and vertebrae generally), 2:18 (explaining intervertebral discs); 3 *id.* § 28:382 (discussing various spinal surgeries); 7 *id.* §§ 71:2 (discussing terminology of the spine), 71:143 (defining spinal stenosis), 71:178-179 (describing disc bulge and herniation).

had "neurogenic claudication symptoms, including shocks that . . . caused her to buckle over and numbness in her feet." *Id.* at 20; *see also id.* at 10-11, 22.

On cross-examination, Dr. Prisk made several concessions. He agreed that Claimant's stenosis at L3-4 was degenerative in origin, that the 2019 MRI findings were similar to the 2015 study, and that by July 2021, roughly three months before October 15th, Claimant already had a left-sided radiculopathy. Dr. Prisk could not opine that the October 15th work activities "caused the increase in stenosis from the 2019 MRI to the 2021 MRI," *i.e.*, the post-injury MRI, when the stenosis progressed from moderate to severe. *Id.* at 42, 44. For Dr. Prisk, the post-October 15th aggravation of Claimant's symptoms reflected the "cumulative effect of the work that she was doing." *Id.* at 44. Dr. Prisk also agreed that his opinion rested primarily on Claimant's subjective reports of increased pain after October 15th, pain "involving both the left and the right side, as well as descriptions of claudication type of symptoms, certainly . . . a sign of worsening stenosis . . . ." *Id.* at 53; *see id.* at 33, 36, 38.

Dr. Grandrimo, Employer's expert, also examined Claimant once and reviewed her medical records. Dr. Grandrimo's examination recorded a "positive straight leg raise on the left" and was otherwise unremarkable.[9] Grandrimo Dep. Tr. at 16-17. Dr. Grandrimo opined that Claimant did not sustain any injury on October 15th. Dr. Grandrimo attributed Claimant's ongoing symptoms to her "significant chronic history of pain issues and low back issues . . . ." *Id.* at 17-18. Dr. Grandrimo rejected any work-related cause. *Id.*

Dr. Grandrimo's rejection rested on, *inter alia*, a dermatomal analysis.

---

[9] This "is a procedure for stretching the sciatic nerve to see if the patient's radicular symptomatology is reproduced. Each hip is alternately flexed with the knee extended; the extent to which each leg can be lifted is noted. Normally, the leg can be raised some 70 to 80 degrees without discomfort if there is no pathology." 7 Att'ys Med. Advisor § 71:8.

At the L3-4 level, per Dr. Grandrimo, the nerve involved is at L4, which is associated with a knee reflex. *Id.* at 21. Claimant's numb toes, per Dr. Grandrimo, fell into "different dermatomal distributions" from L4. *Id.* at 22. The toe numbness, per Dr. Grandrimo, did not "correlate with what the MRIs are . . . saying is the newfound reason . . . why she is having these issues at L3, 4." *Id.* (citation modified).[10]

Dr. Grandrimo also acknowledged a dating error in his IME report: he misstated a July 2021 record as July 2019. *Id.* at 32-33; Ex. D-B (Grandrimo's report), at 3. He also erroneously testified that Claimant had back surgery in 2015. Grandrimo Dep. Tr. at 13, 39; *cf.* Ex. D-B, at 2 (reflecting Claimant's late 2000s back surgery).[11] Dr. Grandrimo declined to change his causation opinion. Grandrimo Dep. Tr. at 40.

*B. Arguments*

Turning to the parties' arguments, Claimant contends that the WCJ's findings are unsupported by substantial evidence and that the WCJ's credibility determinations were arbitrary and capricious. Pet'r's Br. at 18. She first challenges Dr. Grandrimo's position that nothing changed in her back condition before and after the October 15th work activities. *Id.* at 19.

In support, Claimant identifies several post-October 15th symptoms. First, Dr. Grandrimo found a "positive straight leg raise on the left" leg, which Claimant describes as a "new finding." *Id.* at 19-20. Also, Dr. Grandrimo conceded that when Claimant was seen on October 21, 2021, she had "pain radiating to her left

---

[10] "The skin has been mapped into sections, called 'dermatomes,' in order to show the nerve supply to each area. . . . By studying the dermatomes, it is possible to locate the site of neural disorder or damage . . . ." 1 Att'ys Med. Advisor § 3:52. Simply, per Dr. Grandrimo, Claimant's numb toes could not be from L3-4 nerve issues.

[11] We address the significance of these dating discrepancies below. We note that the record variously states that Claimant's back surgery occurred in 2008 or 2009; the exact year is not dispositive.

foot, which was not a symptom that she had prior to the work injury." *Id.* at 20. Second, in September 2022, Dr. Slotkin diagnosed Claimant with "neurogenic claudication symptoms, including shock and buckling over." *Id.* Third, Claimant's MRIs document progression from "stenosis at L4-5 and disc fragments at L5-S1" in July 2019 to "herniated discs at L4-5, left sided, and left sided herniated disc at L5-S1" in May 2022, with an October 2021 post-injury MRI showing "a disc bulge with superimposed central [herniation] at L3-4." *Id.* Claimant characterizes these as "new findings since the work injury." *Id.*

Claimant further criticizes the WCJ's observation regarding the MRIs as arbitrary. Specifically, the WCJ had observed that "Dr. Prisk relied on the May 19, 2022 MRI which called the finding at L3-4 a disc herniation, whereas the MRIs dating back to 2015 called it a broad-based bulge." *Id.* at 22 (quoting WCJ Op. at 8). In Claimant's view, it was "arbitrary, capricious, and irrational [for the WCJ] to criticize the doctor for relying on diagnostic studies taken post injury, which document a L3-4 disc herniation just because the MRIs done prior to the work injury characterize it as a broad based bulge." *Id.* Claimant reasons "the fact that the May 19, 2022 MRI indicates that there is a disc herniation at L3-4 is certainly evidence of the worsening of . . . Claimant's back condition post work injury." *Id.*

Claimant next challenges Dr. Grandrimo's dermatomal analysis, which concluded that Claimant's numb toes could not be from the L4 nerve. *Id.* at 20-21. Dr. Prisk countered that the numb toes reflected neurogenic claudication, a "global" nerve condition affecting multiple nerves. Prisk Dep. Tr. at 21, 27. Per Claimant, "Dr. Grandrimo never contested Dr. Prisk's opinion that the Claimant's symptoms resulted from the neurogenic claudication." Pet'r's Br. at 21. Claimant insists that Dr. Grandrimo and the WCJ disregarded Dr. Prisk's competing testimony. *Id.*

9

Claimant relatedly contends the WCJ mischaracterized Dr. Prisk's claudication testimony. *Id.* at 21-22. Per Claimant, Dr. Prisk connected the neurogenic claudication symptoms to her October 15th work activities. *Id.* Claimant reiterates Dr. Prisk's testimony that her "complaints of pain increased" after October 15th, reflecting "symptoms involving both the left and the right side as well as descriptions of claudication type of symptoms, certainly that is a sign of worsening stenosis, correct." *Id.* at 22 (citation modified). From that testimony, Claimant concludes that the WCJ's finding "that Dr. Prisk did not attribute the claudication symptoms to the work the Claimant did on October 15, 2021, is certainly arbitrary, capricious, and irrational." *Id.*[12]

Employer counters that the WCJ properly exercised his discretion in crediting Dr. Grandrimo over Dr. Prisk on the cause of Claimant's worsening stenosis. Resp't's Br. at 24. Employer points to Dr. Prisk's concession: Claimant had longstanding "degenerative changes in her lumbar spine," and that Dr. Prisk "could not relate the worsening of these longstanding degenerative changes to Claimant's work duties on the alleged date of injury of 10/15/21." *Id.* at 24-25 (emphasis omitted).

Employer also stresses two findings in Dr. Grandrimo's testimony that the WCJ relied upon. First, Claimant "had a significant, long, and chronic history of low back pain and issues, and . . . there was no difference in Claimant's MRI findings, or physical examination findings, from before and after the alleged work injury." *Id.* at 25 (citation modified). Second, "there were no objective findings on physical examination that correlated with the L3-4 dermatomal distribution, and . . .

---

[12] Claimant summarily complains that the Board failed to address the WCJ's factfinding issues or "offer any analysis of the evidence." Pet'r's Br. at 23. Claimant, in conclusory fashion, also asserts that the WCJ erred by "failing to address Dr. Grandrimo's misreading and confusion about the medical records . . . ." *Id.* at 24.

Claimant's symptoms in the toes do not relate to the L4 dermatome . . . ." *Id.* (citation modified).

*C. Legal Standards*

A "claimant has the burden of proving a causal relationship between a work-related incident and his alleged disability." *Lewis v. Commonwealth*, 498 A.2d 800, 802 (Pa. 1985) (citations omitted). When "no obvious causal connection" exists "between an injury and the alleged cause," unequivocal medical testimony must establish that connection. *Id.* (citation omitted). Generally, in reviewing whether medical testimony has unequivocally established a causal connection, we review "the medical witness's entire testimony . . . taken as a whole and a final decision should not rest upon a few words taken out of the context of the entire testimony." *Id.* at 803 (citation modified).

To prove causation, a claimant must present substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gibson v. Workers' Comp. Appeal Bd. (Armco Stainless & Alloy Prods.)*, 861 A.2d 938, 943-44 (Pa. 2004) (citation omitted). We test substantial evidence by ascertaining "whether the evidence admitted is competent, and if it is competent, whether it is sufficient to support the administrative finding." *Id.* at 944. "Evidence offered by [a claimant] was not rendered insubstantial by the mere fact that it was contradicted by evidence introduced by" the employer. *Bethenergy Mines, Inc. v. Workmen's Comp. Appeal Bd. (Skirpan)*, 612 A.2d 434, 437 (Pa. 1992) (*Bethenergy*).

Relatedly, credibility "determinations are within the exclusive province of the [WCJ] and findings of fact can be overturned only if they are arbitrary and capricious." *Lehigh Cnty. Vo-Tech Sch. v. Workmen's Comp. Appeal Bd. (Wolfe)*, 652

11

A.2d 797, 800 (Pa. 1995) (*Wolfe*) (citations and footnote omitted). A capricious disregard exists when, *inter alia*, "the agency expressly refused to resolve conflicts in the evidence and make essential credibility determinations," or no substantial evidence supports a factual finding. *Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 812 A.2d 478, 486 & n.11 (Pa. 2002) (*Marlowe*) (footnote omitted). We do not reweigh the evidence. *Wolfe*, 652 A.2d at 800; *Bethenergy*, 612 A.2d at 437.

### *D. Discussion*

Instantly, substantial evidence supports the WCJ's findings, and the WCJ's credibility determination was neither arbitrary nor capricious. The WCJ gave several reasons for crediting Dr. Grandrimo's testimony over Dr. Prisk's. WCJ Op. at 8. Those reasons withstand each of Claimant's challenges. *See, e.g.*, *Marlowe*, 812 A.2d at 486 & n.11; *Wolfe*, 652 A.2d at 800.

Claimant's first challenge concerns several post-October 15th symptoms that she contends demonstrate that her condition changed after October 15th: (1) a positive straight-leg raise and pain radiating to her left foot; (2) Dr. Slotkin's September 2022 neurogenic claudication diagnosis; and (3) MRIs reflecting a progression from a disc bulge to a herniation. Pet'r's Br. at 19-20.

Claimant's post-October 15th symptoms document *progression*, which alone does not prove *causation*. They do not because Claimant has a longstanding degenerative spinal condition documented since the late 2000s. The WCJ credited Dr. Grandrimo's opinion that Claimant's worsening symptoms reflected "the natural progression of her degenerative condition without contribution of any work injury." WCJ Op. at 8. Dr. Grandrimo's opinion was also consistent with MRI findings showing continued worsening of her stenosis through the May 2022 MRI. *Id.*

12

Further, Dr. Prisk, Claimant's expert, conceded on cross-examination that he could not attribute her worsening stenosis to the October 15, 2021 work activities. Prisk Dep. Tr. at 42, 44 (reflecting his review of Claimant's MRIs before and after October 15th). Given that concession, and the WCJ's crediting of Dr. Grandrimo's opinion, the WCJ properly declined to infer causation. *See Lewis*, 498 A.2d at 802.

Claimant's MRI challenge fails for the same reason. *See* WCJ Op. at 8 (observing that Dr. Prisk relied on the May 2022 MRI calling the L3-4 finding a disc herniation, and that MRIs dating back to 2015 labeled the same finding a broad-based bulge). Claimant argues that the May 2022 MRI evidences the worsening of her back condition after October 15th. But again, Claimant's expert could not attribute her worsening stenosis to the October 15th work activities. *See* Prisk Dep. Tr. at 44.

Apart from the worsening stenosis, Claimant also challenges Dr. Grandrimo's dermatomal analysis. WCJ Op. at 8. The WCJ weighed each party's competing explanations and credited Dr. Grandrimo's analysis over Dr. Prisk's analysis. *Compare* Grandrimo Dep. Tr. at 21-22 (opining that Claimant's numb toes could not be from the L4 nerve), *with* Prisk Dep. Tr. at 21, 27 (offering a competing explanation that numb toes reflected neurogenic claudication). The WCJ did not disregard Dr. Prisk's competing testimony. *See Wolfe*, 652 A.2d at 800; *see also Bethenergy*, 612 A.2d at 437 (holding that a reviewing court does not reweigh the credibility of the witnesses).

Claimant's related challenge regarding Dr. Prisk's claudication testimony also fails. *See* Pet'r's Br. at 22 (characterizing the WCJ's finding "that Dr. Prisk did not attribute the claudication symptoms to the work the Claimant did on" October 15th as "arbitrary, capricious, and irrational"). Dr. Prisk described Claimant's claudication symptoms as "a sign of worsening stenosis," but Dr. Prisk

13

conceded he could not correlate the worsening stenosis with Claimant's October 15th work activities. *See* Prisk Dep. Tr. at 44 ("I cannot."), 53. Read as a whole, Dr. Prisk's testimony did not causally connect claudication to the October 15th work activities. Accordingly, the record supports the WCJ's finding. *See Lewis*, 498 A.2d at 802.

In sum, the WCJ's reasons for crediting Dr. Grandrimo over Dr. Prisk rest on substantial evidence of record, and none of those reasons depends on a material misapprehension. WCJ Op. at 8. As a reviewing court, we inquire only into whether Dr. Grandrimo's credited testimony supports the WCJ's findings. *See Gibson*, 861 A.2d at 944. For these reasons, the WCJ's credibility determination was not arbitrary and capricious. *See Wolfe*, 652 A.2d at 800.[13]

## IV. CONCLUSION

Accordingly, we affirm. At bottom, the issue was whether the October 15th work incident aggravated Claimant's longstanding lower back condition or whether her symptoms reflected the natural progression of that condition. The WCJ, as factfinder, found for Employer, and substantial evidence supports the WCJ's decision.

_____
**LORI A. DUMAS, Judge**

President Judge Cohn Jubelirer did not participate in this decision.

---

[13] We reject Claimant's conclusory argument that the Board failed to analyze the evidence because that is not the Board's role. *See* Pet'r's Br. at 23; *Bethenergy*, 612 A.2d at 437. We similarly reject Claimant's conclusory assertion that the WCJ erred by failing to address Dr. Grandrimo's misreading and confusion about the medical records. Pet'r's Br. at 24. Her argument is waived for insufficient development, and, regardless, errors in an expert's testimony or report go to weight. *See Marshall v. Se. Pa. Transp. Auth.*, 300 A.3d 537, 550 n.22 (Pa. Cmwlth. 2023); *Wolfe*, 652 A.2d at 800.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Christine Hamilton,               :
          Petitioner      :
                        :   No. 102 C.D. 2025
             v.           :
                        :
Ventura Foods, LLC (Workers'   :
Compensation Appeal Board),    :
          Respondent   :

## O R D E R

AND NOW, this 3rd day of June, 2026, we AFFIRM the order of the Workers' Compensation Appeal Board, entered on December 19, 2024.

**LORI A. DUMAS, Judge**